Filed 3/6/25  Whitman v. Ramondino CA3

# NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| ADRIANA H. WHITMAN, | C097147, C098864 |
| Plaintiff and Appellant, | (Super. Ct. No. SDR0055416) |
| v. | |
| STEPHEN RAMONDINO, | |
| Defendant and Respondent. | |

This is a high-conflict family law case primarily involving protracted proceedings related to child custody and visitation rights.  Plaintiff Andrianna H. Whitman (mother) and defendant Stephen Ramondino (father) were in a 10-year relationship (2008-2018) and never married.  In 2009, they adopted A.R. (now 15 years old).  Seven years ago, mother filed suit to establish parental rights regarding child custody, visitation, and support.  In this consolidated appeal, mother challenges three orders issued by the family court:  (1) the order directing father to pay mother need-based attorney fees and costs in

the amount of $75,000 pursuant to Family Code section 2030,[1] (2) the order "reappointing" a parenting coordinator (special master) and requiring the parties to sign her standard contract without modification, and (3) the order denying mother's request for postjudgment interest on the fee award and the costs she incurred in enforcing the award. For the reasons explained below, we affirm the fee award (judgment), reverse the remaining two challenged orders, and remand the matter for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

We do not attempt to recite in detail the underlying facts in this long-running matter. Instead, we briefly summarize the pertinent facts and procedure.

*The Parties*

Father is a board certified psychiatrist and medical doctor. In 2008, he began dating mother. At that time, mother worked as an office manager for father's medical practice.

The parties never married. However, in 2008, they "entered into a non-marital cohabitation agreement." According to father, this agreement "controls the effect" of the parties' separation on "the business" (i.e., father's medical practice).

In October 2009, the parties adopted A.R. "from birth."

*Commencement of the Instant Parentage Action*

In January 2018, mother left the family home in Monterey due to father's alleged infidelity, taking A.R. with her to Nevada County. Around the same time, mother withdrew more than $350,000 from the parties' joint bank accounts.[2] Mother also retained legal counsel and paid a retainer of $30,000. Shortly thereafter, mother initiated

---

[1] Undesignated statutory references are to the Family Code.

[2] These funds are the subject of a separate civil lawsuit between the parties, which was filed by father in Monterey County in January 2018. In that action, mother filed a cross-complaint. According to father, mother seeks damages in the amount of $3,000,000.

2

the instant parentage action in Nevada County, requesting child support and attorney fees ($10,000) from father under section 2030 due to a disparity in funds to retain and pay for counsel.[3]  At that time, A.R. was eight years old.

Following the parties' separation, father earned more than $19,000 per month and up to approximately $34,000 per month from 2018 through 2022.[4]  By contrast, mother earned little to no income because she was homeschooling A.R., and because she had difficulty earning money as a real estate agent (since February 2022) "due to a downturn in the real estate market and [her] newness to this field after a prolonged absence raising [A.R.]."

---

[3]  Subdivision (a) of section 2030 provides:  "In a proceeding for dissolution of marriage, nullity of marriage, or legal separation of the parties, and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding."  The public policy underlying section 2030 (i.e., need-based attorney fees and costs) is to level " ' "the playing field" ' " and permit " 'the lower-earning spouse to pay counsel and experts to litigate the issues in the same manner as the spouse with higher earnings.' "  (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1315 (*Tharp*).)

As we explain more fully *post*, following her initial request for need-based attorney fees and costs under section 2030, mother subsequently moved for an award of such fees and costs under section 7605, which is the governing statutory provision because the parties never married.

[4]  In connection with child support proceedings, the parties stipulated that father's gross income was as follows:  2018--$245,621; 2019--$248,971; 2020--$371,160; 2021--$394,111.  The record reflects that father's gross income for 2022 was $410,856.  According to father, his income was "exaggerated" from 2020 to 2022 "due to [his] extraordinary work schedule to finance litigation costs pertaining to the best interest of [A.R.]."

3

*Child Support Order*

In March 2018, the family court ordered father to pay $2,100 per month in child support.

*Order in Related Civil Action*

In July 2018, the trial court in the related civil action filed by father in Monterey County (see footnote 2) issued an order prohibiting the parties from using most of the funds mother withdrew from the parties' joint bank accounts (approximately $280,000), absent a court order or agreement of the parties.[5]

*Child Custody Evaluator's Report and Transfer to Placer County*

In that same month, the court-appointed child custody evaluator (Dr. Michael Kerner) issued a report indicating that the parties should work towards equal custody and parenting time, and that the parties and A.R. should participate in therapy.[6] Notably, Dr. Kerner found that mother had "significant counter-productive protectiveness" over A.R. (e.g., mother believed father should have limited contact with A.R., including no overnights), which was causing a "resist refuse dynamic." That is, a pattern of behavior where a child (A.R.) refuses or resists spending time with a parent (father).

In September 2018, the matter was transferred from Nevada County to Placer County.

*Partial Stipulated Judgment and Need-Based Attorney Fee Award*

In January 2019, father moved to the Sacramento area to be closer to A.R.

---

[5] The parties subsequently agreed (on two separate occasions) that they could each use a portion of these funds ($25,000 total) for litigation expenses. According to father, these funds are "family savings."

[6] A "child custody evaluator" is a court-appointed investigator. (Cal. Rules of Court, rule 5.220, subd. (c); see *id.* subd. (b).) The Family Code specifically authorizes the appointment of child custody evaluators in contested proceedings involving child custody or visitation rights. (§ 3111, subd. (a).)

In March 2019, the parties participated in counseling at family court services for the purpose of establishing a parenting plan for A.R.

In April 2019, mother filed a request for order (RFO), seeking (among other things) need-based attorney fees from father in the amount of $40,000. At that time, mother was the "primary custodial parent"; father's custodial time share for 2018 and 2019 was only 16.3 percent. In support of her RFO, mother explained: "I was employed by [father], which I no longer am. I was earning $4,000/month. Now I have no income whatsoever. I have little college education and no special training or licenses. [Father] earns approximately $25,000/month as a licensed psychiatrist. [Father] is continuing to heavily litigate this case. I owe my attorney $14,625, and [father] filed another RFO last Friday. There is a huge disparity of income and assets between us. In order for me to be able to continue to have representation, I need to be awarded [section] 7605 fees."[7]

In January 2020, Dr. Kerner issued a supplemental report indicating that immediate intervention was necessary because father's relationship with A.R. had deteriorated. At that time, A.R. had refused to visit father for several months. Dr. Kerner's supplemental report noted that the parties needed separate therapists, a parenting coordinator,[8] and to participate in family systems therapy. The supplemental report also

---

[7] Subdivision (a) of section 7605 provides: "In any proceeding to establish physical or legal custody of a child or a visitation order under this part, and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal representation to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding."

[8] A parenting coordinator is also known as a child custody special master. The coordinator is a quasi-judicial officer who coaches parents on effective co-parenting, assists parents in making joint parenting decisions, and resolves disputes among the parents concerning a court-ordered parenting plan through an informal process.

5

recommended that A.R. no longer be homeschooled, and identified a "transition" for A.R. so she could have near-equal time with her parents.

In August 2020, after a three-day trial, the family court issued temporary orders regarding child custody and visitation rights. The parties also agreed to participate in family systems therapy.

In January 2021, mother stopped participating in family systems therapy. In March 2021, she filed a Chapter 7 bankruptcy petition. In August 2021, the family court issued an order admonishing mother to follow court orders, including participating in the previously ordered family systems therapy.

In September 2021, the family court appointed a new family systems therapist and ordered father to pay the costs of her services, "subject to reallocation." The court also ordered father to pay mother attorney fees in the amount of $10,000, with $3,500 to be paid by the end of the month and the remainder ($6,500) due upon the re-commencement of family systems therapy "with no interference from Mother."

In December 2021, after a two-day trial, the parties reached an agreement on child custody and visitation rights. The parties also agreed to the appointment of a family therapist and a new family systems therapist, either Deborah Barnes or another specified person.

In February 2022, mother's Chapter 7 bankruptcy petition was granted, resulting in a full discharge of her debts, including substantial portions of the attorney fees she owed in connection with this matter (more than $220,000).

In March 2022, father (then 56 years old) filed an income and expense declaration, which indicated that he was earning around $27,000 per month but had monthly expenses exceeding that amount. The declaration further indicated that father had more than $26,000 in credit card debt and had incurred attorney fees in this matter in excess of $285,000. The declaration also noted that father had $20,000 in assets (cash, checking, and savings accounts), had paid A.R.'s counsel approximately $39,000 in fees, had

6

expended nearly $40,000 in fees in the related civil action, had paid significant litigation costs in this action for experts (e.g., more than $12,000 to Dr. Kerner in 2020), and had retirement accounts with an aggregate balance of more than $1,000,000.[9]

Two weeks later, mother (then 49 years old) filed an income and expense declaration indicating that she had been working as a real estate agent since February 2022, but had not obtained her real estate license or earned any income over the past 12 months, had monthly expenses of approximately $4,000, was receiving public assistance (Medi-Cal benefits, food stamps), and owed her attorney approximately $35,500 in fees that were not discharged in the bankruptcy proceedings. Mother's declaration also indicated that she was living with her "significant other" (i.e., new partner),[10] had assets in the amount of approximately $125,000 (which were subject to a lien by her attorney), a retirement account worth approximately $37,500, and around $6,000 in cash and other personal property.

In June 2022, the parties entered into a partial stipulated judgment as to child custody, visitation, and ongoing therapy. Among other things, the parties agreed to a visitation schedule and to share joint legal and physical custody of A.R.[11] The parties also agreed to the appointment of a family therapist to "help maintain existing healthy relationships between the parties and [A.R.] going forward," and to the appointment of Barnes as the family systems therapist (i.e., parenting coordinator/special master) to work with the family therapist to informally resolve issues without the need to resort to formal

---

[9] As part of his income and expense declaration, father noted that, in the related civil action, mother was claiming an "equal interest" to the funds in his retirement accounts.

[10] Mother's new partner was employed by the United States Air Force. According to father, he held the rank of colonel.

[11] Father's custodial time increased from 16.3 percent in 2018 and 2019 to 19.3 percent in 2020, 43.6 percent in 2021, and 50 percent in 2022 and beyond.

judicial proceedings. The partial stipulated judgment noted that the parties and the family therapist were in the process of negotiating the "terms and conditions" of the parenting coordinator's (i.e., Barnes's) role, and that the parties' final agreement as to Barnes's role would be made into an enforceable order.

In July 2022, after a two-day hearing during which the family court heard evidence that father had expended approximately $360,000 in litigating this case (including more than $285,000 on attorney fees for his counsel), that mother had paid her counsel more than $104,000 in attorney fees, that more than $200,000 in attorney fees mother owed to her counsel were discharged in bankruptcy proceedings, and that mother owed her counsel more than $35,000 for post-bankruptcy services, the family court awarded mother need-based attorney fees and costs in the amount of $75,000 pursuant to section 2030. In so ruling, the court stated: "[T]here is a disparity in access to resources in favor of [father]. . . . [His] base salary is $22,000 per month, from his base salary he pays $514 per month for health insurance and contributes $3,300 to a 401(k) account. [Mother] is working toward her real estate license. She has no other income, although the court imputed minimum wages to her."[12] The court further stated: "On a need and ability analysis the court finds that a reasonable attorney[] fees for this matter to be $150,000. Although [mother] has the need for fees, [father] does not have the liquid resources with which to meet fees of that magnitude, nor does the court find that it would be reasonable to award fees in that magnitude. [¶] Having considered all of the evidence, the court finds reasonable attorney fees award to be $75,000 payable from [father] to [mother]. The fees shall be all due and payable on or before September 30, 2022."

---

[12] Prior to the hearing, the parties stipulated that mother's imputed income would be minimum wage ($15) for 40 hours per week going back to January 2018. In other words, the parties agreed that mother's gross income was $31,200 or $2,600 per month.

The family court denied the parties' "competing requests" for sanctions under section 271, which are "appropriate whenever a party's dilatory and uncooperative conduct has frustrated the policy of promoting settlement of litigation and cooperation among litigants." (*Tharp, supra*, 188 Cal.App.4th at p. 1317; see also *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1524 [section 271 "imposes a 'minimum level of professionalism and cooperation,' to effect the policy favoring settlement of family law litigation—and a reduction of the attendant costs"].)[13]  In so ruling, the court stated: "Although it is correct that the resolution that was reached could have been attained early on, this disregards the environment within which such custody battles proceed.  The court is also cognizant of the fact that a substantial portion of the litigation was in many ways the result of over identification of counsel with the emotional needs of their client.  The ability to provide honest and frank assessment of the client's ability to achieve an overreaching goal becomes clouded.  This occurred in this matter.  [¶]  The court observed over the course of multiple hearings that counsel drove the argument more so than the clients.  This is unfortunate, but was the reality.  Hence, the court declines to sanction either side, finding them both to have been unable or unwilling to provide[] effective counsel."

---

[13]  Subdivision (a) of section 271 provides:  "Notwithstanding any other provision of this code, the court may base an award of attorney's fees and costs on the extent to which any conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys.  An award of attorney's fees and costs pursuant to this section is in the nature of a sanction.  In making an award pursuant to this section, the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities.  The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed.  In order to obtain an award under this section, the party requesting an award of attorney's fees and costs is not required to demonstrate any financial need for the award."

In September 2022, the family court signed the partial stipulated judgment the parties executed in June 2022, which included the appointment of Barnes as the parties' parenting coordinator.

In mid-October 2022, mother appealed from the fee order.

*Reappointment of Parenting Coordinator and Satisfaction of Fee Judgment*

In late October 2022, mother sent father a copy of the parenting coordinator's (i.e., Barnes's) standard contract with various proposed modifications. Of relevance here, the modifications included the deletion of language allowing "some decisions" of the parenting coordinator to "become court orders automatically," and deletion of the language authorizing the family court to adopt the decisions of the parenting coordinator "as court orders that have the same force and effect as orders made by the Court in a contested proceeding." Mother also proposed modifying Barnes's contract by deleting the following language: "I waive the right to formal court litigation over the issues assigned to the [parenting coordinator] . . . subject to the Court's power to review the [parenting coordinator's] decision."

In December 2022, father filed two RFOs. The first sought a determination that he satisfied the fee judgment. In support of his request, father explained that he paid mother $75,000 by the court-ordered deadline (September 30, 2022), but mother refused to "grant full satisfaction of [j]udgment." In his second RFO, father sought an order setting forth the terms of the parenting coordinator's role. Shortly thereafter, mother filed a motion to tax costs, claiming that father owed interest on the fee judgment ($1,889) and the costs ($144) she incurred in enforcing the judgment (preparing and issuing the abstract of judgment, and recording and indexing the abstract of judgment).

In February 2023, mother filed a responsive declaration asserting that father had not satisfied the fee judgment because he failed to pay interest on the judgment or the costs mother incurred in enforcing the judgment.

10

In March 2023, father filed two "supplemental" briefs, the first of which concerned his RFO regarding the fee judgment. In his second supplemental brief, father requested an order requiring mother to sign Barnes's standard parenting coordinator contract without modification, and an order directing the parties to "commence work" with Barnes immediately, with father paying for 70 percent of her costs and mother paying the remaining 30 percent. In support of his request, father noted that mother had stopped attending family counseling sessions in January 2021 and refused to sign Barnes's standard contract without modification after the parties agreed to utilize her services in June 2022. In response, mother argued that the family court had no "jurisdiction" or "legal authority" to order her to sign Barnes's contract without modification.

In April 2023, after a hearing, the family court issued an order vacating the parties' stipulation to appoint Barnes as their parenting coordinator. The court "reappoint[ed]" Barnes to serve in that same capacity and ordered the parties to sign her standard contract "as she require[d]" (i.e., without modification) and to split the costs of her services, with father paying 70 percent of the costs and mother the remaining 30 percent. In so ruling, the court rejected mother's attempt to "edit" the terms of Barnes's contract (i.e., alter or delete certain provisions), and mother's claim that she was unable to pay for any portion of Barnes's services. In addition, the court found that father had "satisfied the [fee] judgment in full" prior to the court-ordered deadline. In making this finding, the court denied mother's request for postjudgment interest on the fee award and the costs she incurred in enforcing the judgment.

In June 2023, mother appealed from the family court's April 2023 orders.

*Consolidation of Appeals and Appellate Briefing*

In August 2023, on our own motion, we consolidated mother's appeals for all purposes, including argument and disposition. The matter was fully briefed in early

11

November 2024 and assigned to this panel in late November 2024. Mother is represented by counsel on appeal and father is proceeding as a self-represented litigant.

## DISCUSSION

Mother challenges three orders issued by the family court: (1) the July 1, 2022, order awarding mother need-based attorney fees and costs in the amount of $75,000 pursuant to section 2030, (2) the April 5, 2023, order requiring the parties to sign the parenting coordinator's standard contract "as she required" (i.e., without modification) and to split (70/30) the costs of her services, and (3) the April 5, 2023, order finding that father had fully satisfied the fee judgment. We address these orders in turn below.

### I

### *Need-Based Attorney Fees and Costs Award*

Mother first argues the family court erred in awarding her need-based attorney fees and costs in the amount of $75,000 pursuant to section 2030. According to mother, the court abused its discretion by not awarding her $150,000.

A. *Governing Law*

Before turning to the merits of mother's claim, we must initially decide whether the family court's reliance on section 2030 requires reversal of the challenged fee award. In the proceedings below, both mother and the court cited section 2030 as the governing law.[14] Section 2030, however, applies to fee awards in marital actions such as petitions for dissolution, legal separation, or nullity. (See *Robert J. v. Catherine D.* (2005) 134 Cal.App.4th 1392, 1400.) Because this is a parentage action involving unmarried parents that were not in a domestic partnership, it is governed by section 7605 and other

---

[14] We recognize that, prior to the challenged fee ruling, mother made an "amended request" for need-based attorney fees and costs under section 7605. Mother also filed a declaration from her counsel in February 2023 indicating that mother was seeking need-based attorney fees and costs pursuant to sections 7605 and 7640. However, neither party informed the family court that it had erroneously relied on section 2030.

12

provisions of the Uniform Parentage Act (UPA) (§ 7600 et seq.). (*Robert J.*, at pp. 1399 & fn. 5, 1400 [for parents who are neither married nor in domestic partnerships, petitions to establish parentage under the UPA represent the only method for resolution of child custody, visitation, and support issues].)

We conclude the family court's improper reliance on section 2030 does not require the fee award be set aside. To be reversible, an error must be prejudicial, resulting in a miscarriage of justice. (*D.D. v. Pitcher* (2022) 79 Cal.App.5th 1047, 1057; Cal. Const., art. VI, § 13.) Given the virtually identical language of sections 2030 and 7605 and their similar purpose, we are convinced that the result would have been the same if the family court had applied section 7605 rather than section 2030 to mother's request for need-based attorney fees and costs. (*Kevin Q. v. Lauren W.* (2011) 195 Cal.App.4th 633, 643 (*Kevin Q.*) [recognizing that, "in 2004, the Legislature drafted section 7605 and amended section 2030 to be identical statutes"]; *N.S. v. D.M.* (2018) 21 Cal.App.5th 1040, 1053 (*N.S.*) [section 2030 is "virtually identical" to section 7605]; see §§ 7605, subd. (a), 2030, subd. (a).) "The aim of both statutes 'is *not* the redistribution of money from the greater income party to the lesser income party' but instead '*parity*: a fair hearing with two sides equally represented.' [Citation.] 'The idea is that both sides should have the opportunity to retain counsel, not just (as is usually the case) only the party with greater financial strength.' " (*N.S.,* at p. 1053.)

B. *Applicable Legal Principles and Standard of Review*

The UPA (§ 7600 et seq.) " 'provides the statutory framework for judicial determinations of parentage, and governs private adoptions, paternity and custody disputes, and dependency proceedings.' " (*In re D.A.* (2012) 204 Cal.App.4th 811, 824.) The UPA is "the procedural vehicle by which unmarried parents establish their rights vis-à-vis each other and their children." (*Erika K. v. Brett D.* (2008) 161 Cal.App.4th 1259, 1267.) Parentage actions may, as here, involve the same issues that arise in other family

matters, such as parental rights to custody, visitation, and child support. (See *Robert J. v. Catherine D.*, *supra*, 134 Cal.App.4th at pp. 1399-1400 & fn. 5.)

Sections 7640 and 7605 are the pertinent statues governing fee awards in cases falling under the UPA. Section 7640 provides: "The court may order reasonable fees of counsel, experts, . . . and other costs of the action . . ., to be paid by the parties, . . . in proportions and at times determined by the court. The court may apply the standards set forth in Sections 2032 and 7605 in making this determination."

Subdivision (a) of section 7605 provides: "In any proceeding to establish physical or legal custody of a child or a visitation order under [the UPA], and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal representation to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding." (See also *N.S.*, *supra*, 21 Cal.App.5th at pp. 1052-1053 [noting that section 7605 allows fee shifting in both an initial proceeding to establish custody or visitation under the UPA and in any proceeding subsequent to entry of a related judgment].)

Subdivision (b) of section 7605 provides: "When a request for attorney's fees and costs is made under this section, the court shall make findings on whether an award of attorney's fees and costs is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs." The required findings set forth in this provision need not be stated in any particular language. (See *N.S., supra*, 21 Cal.App.5th at 1054 [explaining that a court awarding or denying fees under section 7605 must demonstrate on the record that it has considered statutory factors in exercise of its discretion, but " 'no particular language is required in [the] order' "].)

While "section 7640 grants a court the *discretion* to award fees," section 7605, subdivision (a) "requires the court to ensure 'each party has access to legal representation . . . by ordering, *if necessary* based on the income and needs assessments, one party . . . to pay to the other party . . . whatever amount is *reasonably necessary* for attorney's fees . . . . [I]n [making this determination], the court must first assess whether a fee award is necessary to ensure access to legal representation and then, based on that assessment, award that amount which is reasonably necessary to ensure 'each party has access to legal representation.' " (*Kevin Q., supra,* 195 Cal.App.4th at p. 642.)

In evaluating a request for need-based attorney fees and costs under section 7605, a court must engage in "a *comparative analysis* of the parties' circumstances and/or needs," which serves the purpose of "ensuring, 'to the extent possible, that the litigating parties are on an equal footing in their ability to present their cases. . . .' " (*Kevin Q., supra*, 195 Cal.App.4th at p. 643.) Thus, section 7605 focuses on "the parties' '*respective* incomes and needs' and '*respective* abilities to pay.' " (*Kevin Q.*, at p. 643.)

A fee award under section 7605 must be limited to the amount that is "just and reasonable" in light of the relative circumstances of the respective parties, taking into consideration not only the parties' needs and ability to pay but also the conduct of each party and their counsel. (*Darab Cody N. v. Olivera* (2019) 31 Cal.App.5th 1134, 1143 (*Darab Cody*) [a party's tactics are relevant to evaluate the relative need-based fees between the parties and may support the court's decision to deny such fees]; see *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 974-975 [family court may consider trial tactics in determining a fee award under section 2030].) In deciding what is "just and reasonable" under the relative circumstances, the court may consider the "standards and circumstances pertinent [in] a section 2032 comparative analysis." (*Kevin Q., supra,* 195 Cal.App.4th at p. 644; see also *Darab Cody, supra,* 31 Cal.App.5th at pp. 1142-1143.)

Section 2032, subdivision (b) provides: "[T]he court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320. The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances." If the circumstances warrant a fee award, the court "may order payment . . . from any type of property, whether community or separate, principal or income." (§ 2032, subd. (c).)

In determining what is "just and reasonable" under the relative circumstances, section 2032 expressly directs the family court to consider, to the extent relevant, the factors described in section 4320. (§ 2032, subd. (b).) Among other things, those factors include the marketable skills of the supported party, the job market for those skills, the ability of the supporting party to pay taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living, the obligations and assets, including the separate property, of each party, the ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party, the age and health of the parties, the balance of the hardships to each party, and any other factors the court determines are just and equitable. (See § 4320.)

"The findings of the court regarding the actual income and needs of the parties are necessarily subject to a substantial evidence standard of review. The determination of the amount which is 'reasonably necessary' to ensure each party has access to legal representation is a decision necessarily committed to the sound judgment of the trial

16

court, and is, accordingly, subject to review under an abuse of discretion standard." (*Kevin Q., supra*, 195 Cal.App.4th at p. 642.)

The test for abuse of discretion is whether the court exceeded the bounds of reason, and the burden is on the party complaining to establish an abuse of discretion. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)  Where, as here, the trial court has discretionary power to decide an issue, we may not substitute our judgment for that of the trial judge.  We will not disturb the court's exercise of discretion on appeal in the absence of a clear showing of abuse resulting in a manifest miscarriage of justice.  (*Ibid*.)  We therefore must affirm the fee award  " 'unless no judge reasonably could make the order.' "  (*In re Marriage of Turkanis and Price* (2013) 213 Cal.App.4th 332, 345.)

C.  *Analysis*

We see no abuse of discretion.  The record reflects that the family court considered the parties' evidence and arguments on the issue of need-based fees, and it did exactly what section 7605 required it to do:  it made findings on whether a fee award was appropriate, whether there was a disparity in access to funds to retain counsel, and whether one party was able to pay for legal representation of both parties.  (§ 7605, subd. (b).)  In making these findings, the family court considered the parties' respective needs and ability to pay based upon their current income, savings and debt, as well as their litigation needs and the reasonableness of the fees already incurred (i.e., the parties' conduct, including litigation tactics).  Given the record before us, and considering all of the evidence viewed most favorably in support of the family court's order, mother has not shown that no judge could reasonably have made the challenged fee award.  (*In re Marriage of Turkanis and Price, supra*, 213 Cal.App.4th at p. 345.)  The family court undertook the analysis required of it and reached a conclusion about "how to apportion the cost of the proceedings equitably between the parties under their relative circumstances."  (*In re Marriage of Falcone & Fyke, supra*, 203 Cal.App.4th at p. 975.)  Mother, for her part, has not shown that the fee award exceeded the bounds of reason.

17

Mother does not challenge the family court's determination that $150,000 was an amount reasonably necessary to ensure that she had access to legal representation under the circumstances of this case. Instead, mother asserts that the court abused its discretion by only awarding her $75,000 because father had the resources (e.g., funds in his retirement accounts) to pay $150,000. According to mother, reversal is required because the evidence in the record does not support the court's finding that father lacked sufficient "liquid financial resources" to pay mother $150,000. We disagree.

Contrary to mother's suggestion, father's ability to pay is not dispositive; "section 7605 does not require the trial court to simply mathematically determine which party has access to more resources and then redistribute those resources." (*Darab Cody, supra*, 31 Cal.App.5th at p. 1143.) Rather, ability to pay is only one of many factors a court considers in determining a "just and reasonable" fee award under the UPA. (See *Darab Cody*, at p. 1142-1143; *Kevin Q., supra*, 195 Cal.App.4th at pp. 643-644; §§ 2032, subd. (b), 4320 [listing relevant factors].) When considering a fee request and determining what is just and reasonable under the circumstances, a court can consider, along with other factors, " ' "the nature of the litigation . . . [and] the success of the attorney's efforts . . . ." ' " (*In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 870.) A court can also consider a party's tactics or lack of compliance with court orders and whether the parties incurred additional costs as a result. (*Tharp, supra*, 188 Cal.App.4th at p. 1314; see §§ 2032, subd. (b), 4320.)

Here, the record makes clear that the challenged fee award was based on the family court's consideration of the totality of the circumstances. The decision to award mother $75,000 (as opposed to $150,000) fell within the court's sound discretion, and we see no reason to disturb it. In deciding to award mother fees in that amount, the court explained: "On a need and ability analysis the court finds that a reasonable attorney's fees for this matter to be $150,000. Although [mother] has the need for fees, [father] does not have the liquid resources with which to meet fees of that magnitude, *nor does*

18

*the court find that it would be reasonable to award fees in that magnitude*." The court went on to deny the parties' respective requests for sanctions under section 271, which (as discussed) authorizes an award of sanctions in the form of attorney fees for any conduct on the part of a party or attorney that frustrates the policy to promote settlement of litigation and reduce the cost of litigation by encouraging cooperation between the parties and attorneys. (§ 271.) In so ruling, the court found that the resolution the parties reached as to child custody and other contested issues could have been attained early on in the litigation, and that a "substantial portion" of the litigation was the result of ineffective representation by the parties' counsel, including the "over identification of counsel with the emotional needs of their client," which "clouded" counsel's ability "to provide [an] honest and frank assessment of the[ir] client's ability to achieve [their overarching] goal." At the hearing on the fee request, mother's counsel characterized this case as "an avoidable nightmare." In so doing, he conceded the case had been "over-litigated," noting that it "could have been resolved back in September of 2018." Mother's counsel stated that he "accept[ed] his degree of responsibility" for vigorously representing mother and for the "things" he may have "gotten" wrong in this case. He also apologized for "any excessiveness" with regard to his behavior.

We agree that the record reflects that the amount of time and resources expended on this matter has been extraordinary and excessive. At the time the challenged fee award was issued, the parties had been litigating for more than four-and-a-half years, with mother incurring attorney fees in excess of $350,000 and father expending more than $360,000, including paying his counsel more than $285,000 in fees and other professional fees and costs generated during the litigation (e.g., child-evaluator's costs, attorney fees for A.R.'s counsel). In concluding that it would be unreasonable to order father to pay mother $150,000 in need-based attorney fees and costs, the family court specifically found that this matter had been over-litigated. This finding is amply supported by the record. As for mother's part, the record discloses that her conduct (e.g.,

19

her initial refusal to allow A.R. to visit father, her role in creating the "refuse resist dynamic" exhibited by A.R., her failure to attend court-ordered family therapy sessions) and the litigation tactics of her counsel significantly and needlessly caused the litigation to be extended, thereby increasing the costs. Indeed, mother does not even attempt to argue, and the record does not reflect, that her counsel used his time effectively and efficiently to resolve the disputed issues. For example, mother provides no reasonable explanation for why it took more than four years for the parties to agree on joint legal custody and shared physical custody on "essentially an equal time basis."

Further, in addition to the conduct of the parties and their respective counsel, the family court was well aware of the parties' financial circumstances. The record shows that mother had earned little to no income during the entire pendency of the action (i.e., from January 2018 to July 2022), even though she had previously worked as a realtor and an officer manager for father's medical practice. There was also evidence that mother had been cohabitating with her new partner,[15] had over $220,000 in attorney fees discharged in bankruptcy, and had taken $30,000 from the parties' joint bank accounts to pay her counsel a retainer prior to the commencement of this action. Over the course of the family law proceedings, father was ordered to pay mother $10,000 in attorney fees, and mother received an additional $25,000 from the parties' joint bank accounts. Thus, in addition to the $75,000 in need-based fees the family court ordered father to pay, mother had access to an additional $65,000, for a total of $140,000, which is an amount just short of what mother concedes was a reasonable and necessary amount to litigate this suit. Notably, there is nothing in the record indicating that counsel's representation of

---

[15] New partner income is relevant in assessing a party's financial circumstances in the context of a fee award under the Family Code. (See *Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 255.) Here, there was evidence that mother was cohabitating with her new partner, but no evidence as to his income.

20

mother was inhibited or impacted in any significant way by a lack of funds. To the contrary, the record reflects that counsel vigorously represented mother throughout the protracted proceedings to preserve her rights. As noted *ante*, the purpose of a need-based fee award under the UPA is to achieve "parity," a fair proceeding with two sides equally represented. Under the circumstances presented, we cannot conclude the family court erred in determining that a fee award in the amount of $75,000 achieved that purpose.

II

*Order Reappointing Parenting Coordinator*

Mother next argues the family court erred in vacating the portion of the parties' stipulated judgment that appointed Barnes as the parenting coordinator, and then reappointing Barnes to serve in that same capacity and requiring the parties to sign her standard parenting coordinator contract without modification. According to mother, absent consent of the parties, the court had no authority to issue an order altering the terms of the partial stipulated judgment, which only provided for Barnes's appointment and did not "empower" the court to "dictate the scope and terms of that appointment" i.e., Barnes's role. Mother adds that the court erroneously delegated judicial authority to Barnes without the consent of the parties.

A. *Applicable Legal Principles*

Code of Civil Procedure section 664.6 provides a summary procedure for entering judgment under the terms of a settlement agreement. (*Pearson v. Superior Court* (2012) 202 Cal.App.4th 1333, 1337; *In re The Clergy Cases I* (2010) 188 Cal.App.4th 1224, 1236.) It provides that when the parties stipulate to settle pending litigation, the trial court may enter judgment pursuant to the terms of the settlement. (Code Civ. Proc., § 664.6, subd. (a).) A trial court, however, is not authorized to add to or modify an express term of the settlement without the parties' mutual consent. (*California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 664; *Leeman v Adams Extract & Spice, LLC* (2015) 236 Cal.App.4th 1367, 1375.)

21

"In family law matters, especially where the parties are unable to curb their animosity toward each other, the trial court may well find it advantageous to designate a separate forum to resolve the parties' differences." (*Ruisi v. Thieriot* (1997) 53 Cal.App.4th 1197, 1207 (*Ruisi*); *In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 5, fn. 2 (*Olson*).) Although the court may not entirely delegate its judicial power (Cal. Const., art. VI, § 1), it has the statutory authority to send a pending action or proceeding, or some issue raised therein, to a referee or special master "for hearing, determination and report back to the court." (*Jovine v. FHP, Inc*. (1998) 64 Cal.App.4th 1506, 1521; Code Civ. Proc., §§ 638, 639; see *Ruisi, supra*, 53 Cal.App.4th at p. 1208 [explaining that there are two types of references a trial court can make: (1) a "general" reference, which empowers a referee or special master to make conclusive determinations without further action by the court, and (2) a "specific" reference, which empowers the referee or special master to make advisory findings that only become binding if adopted by the court].)

"[A]s an expeditious means of resolving disputed [family law] issues, trial courts frequently appoint a subordinate court officer to whom is delegated, pursuant to the stipulation of the parties, the authority to render binding factual findings or judicial determinations." (*In re Marriage of Assemi* (1994) 7 Cal.4th 896, 907; see *Olson, supra*, 14 Cal.App.4th at p. 8, fn. 5 [the best and least expensive method of resolving family law disputes is for the parties to "stipulate not only to the appointment of a special master, but also that the special master be empowered to determine the issues"].) A parenting coordinator is a special master that performs parenting coordination, which is "a hybrid of psychotherapy, mediation, and child custody evaluation." (See *Rand v. Board of Psychology* (2012) 206 Cal.App.4th 565, 580 [describing a parenting coordinator's activities as "the practice of psychology"].)

To comport with the constitutional prohibition against delegation of judicial power, the appointment of a special master to resolve general or non-specific disputes requires the consent of the parties. (Code Civ. Proc., § 638; *Ruisi, supra*, 53 Cal.App.4th

at pp. 1208-1209.) " '[I]f the reference is by agreement of the parties, the parties can stipulate to the special master making determinations which otherwise would be an unlawful delegation of judicial authority.' " (*Ruisi*, at p. 1208; see also *Olson, supra*, 14 Cal.App.4th at p. 8.) In the absence of consent, "the authority of the trial court to direct a special reference is limited to particular issues. The trial court has no power to refer issues other than those explicitly specified by statute." (*Ruisi,* at p. 1209.) Code of Civil Procedure section 639 limits involuntary references to five categories of issues, none of which apply here. (See § 639, subd. (a); *Ruisi*, at p. 1209 [listing the five categories].)

B. *Analysis*

We conclude the family court's order "reappointing" Barnes as the parenting coordinator and requiring the parties to sign her standard contract without modification must be set aside. Here, the parties stipulated to the appointment of Barnes as the parenting coordinator (i.e., special master). However, they did not agree as to the specific role to be served by Barnes other than to assist them in resolving disputes "without resort to the court." As reflected by the terms of the stipulated judgment, the parties did not reach an agreement as to whether Barnes was empowered to render binding determinations on controverted issues without further action by the court. In relevant part, the stipulation stated: "The terms and conditions of the role of the Parenting Coordinator (Family Systems Therapist) [i.e., Barnes] is still being negotiated by the Family Systems Therapist, counsel and the parties. When that agreement is finalized it will be submitted to the court via a stipulation to be made a separately enforceable order of the court." The parties, however, never reached an agreement as to the "terms and conditions" of Barnes's role before the challenged order was issued. And the record makes clear that mother did not consent to Barnes having the authority to make binding determinations on disputed issues.

23

Under the circumstances presented, reversal is required. The family court erred by modifying the terms of the partial stipulated judgment without the consent of the parties. Further, the family court lacked the authority to "reappoint" Barnes as the parenting coordinator/special master and require the parties to sign her standard contract without modification. While the parties stipulated to the appointment of Barnes to serve as the parenting coordinator/special master, they did *not* agree that she could make binding determinations on controverted issues submitted to her without further action by the court. Indeed, mother specifically objected to the delegation of such judicial authority to Barnes. Accordingly, because the terms of Barnes's standard parenting coordinator contract authorized her to render binding determinations in certain circumstances, the family court's order constituted an unlawful delegation of judicial authority. Therefore, we will reverse that order.[16]

### III

### *Postjudgment Interest*

Lastly, mother argues reversal is required because the family court erred in denying her request for postjudgment interest on the fee award. According to mother, interest began to accrue on the date the fee judgment was entered, not on the date when the fee payment to mother was due. Mother adds that she was also entitled to recover the costs she incurred in enforcing the fee judgment.

A. *Applicable Legal Principles and Standard of Review*

"[T]he rules of practice and procedure applicable to civil actions generally . . . apply to, and constitute the rules of practice and procedure in, proceedings under [the Family Code]." (§ 210.)

---

[16] Because we have determined that the challenged order must be set aside, we need not and do not decide whether the family court erred in ordering the parties to split the costs of Barnes's services.

A "money judgment" is the "part of a judgment that requires the payment of money." (Code Civ. Proc., § 680.270; see *id.* § 680.230 [a "judgment" includes an "order"].) "Under California law, then, any judgment that establishes one party owes the other payment is a money judgment for the purposes of [Code of Civil Procedure] section 685.020." (*Felczer v. Apple Inc.* (2021) 63 Cal.App.5th 406, 415-416.) Thus, an order awarding attorney fees constitutes a separate money judgment. (*Id.* at pp. 415-416; see *Stockton Theatres, Inc. v. Palermo* (1961) 55 Cal.2d 439, 443 [explaining that cost awards "are, in fact, separate and complete judgments in themselves"].)

"[T]he accrual of interest is not a discretionary matter but is instead controlled by statute and continues until a judgment is satisfied." (*In re Marriage of McClellan* (2005) 130 Cal.App.4th 247, 259.) Postjudgment interest ordinarily begins to accrue on a money judgment, including the attorney fee portion of the judgment, on the date of entry of the judgment. (Code Civ. Proc., § 685.020, subd. (a); see *Hernandez v. Siegel* (2014) 230 Cal.App.4th 165, 171-172; *Lucky United Properties Investment, Inc. v. Lee* (2010) 185 Cal.App.4th 125, 137-138.) If, however, "a money judgment is payable in installments, interest commences to accrue as to each installment on the date the installment becomes due," "[u]nless the judgment otherwise provides." (Code Civ. Proc., § 685.020, subd. (b).)

"[I]nterest accrues at the rate of 10 percent per annum on the principal amount of a money judgment remaining unsatisfied."[17] (Code Civ. Proc., § 685.010, subd. (a)(1); see *Beeler v. American Trust Co.* (1946) 28 Cal.2d 435, 438 [postjudgment interest on a money judgment continues to accrue during the pendency of an appeal].) "[T]he

---

[17] " 'Principal amount of the judgment' means the total amount of the judgment as entered or as last renewed, together with the costs thereafter added to the judgment pursuant to [Code Civ. Proc.] [s]ection 685.090, reduced by any partial satisfactions of such amount and costs and by any amounts no longer enforceable." (Code Civ. Proc., § 680.300.)

25

underlying reasons for awarding postjudgment interest . . . are to 'compensate[ ] the judgment creditor for the loss of use of the money until the judgment is paid and [to act] as an incentive for the judgment debtor to pay the judgment promptly.' " (*Felczer v. Apple, Inc., supra,* 63 Cal.App.5th at p. 418.)

A judgment creditor is entitled to "the reasonable and necessary costs of enforcing a judgment." (Code Civ. Proc., § 685.040.)  Of relevance here, those costs include "[s]tatutory fees for preparing and issuing, and recording and indexing, an abstract of judgment or a certified copy of a judgment." (Code Civ. Proc., § 685.070, subd. (a)(1).) If a judgment debtor does not file a timely motion to tax (i.e., strike) costs, enforcement costs claimed by the judgment creditor are automatically allowed and added to the judgment. (Code Civ. Proc., § 685.070, subd. (d); see *Briggs v. Elliott* (2023) 92 Cal.App.5th 683, 695 [failure to file a motion to tax costs constitutes a waiver of the right to object to the claimed costs].)  Costs incurred in postjudgment enforcement efforts are incorporated into the principal amount of the judgment and interest accrues upon those costs at the rate of 10 percent per annum. (*Lucky United Properties Investment, Inc. v. Lee* (2013) 213 Cal.App.4th 635, 643.)

The issue of when interest begins to accrue on a monetary judgment is a question of law that we review de novo. (*In re Marriage of Dalgleish & Selvaggio* (2017) 17 Cal.App.5th 1172, 1177-1178; *Roden v. AmerisourceBergen Corp.* (2010) 186 Cal.App.4th 620, 658.)

B. *Analysis*

We conclude the family court erred by denying mother's request for postjudgment interest on the fee award and the costs she incurred in enforcing the fee judgment.  On July 1, 2022, the family court awarded mother need-based attorney fees and costs in the amount of $75,000.  The order provided that father was required to pay this amount by no later than September 30, 2022.  The record reflects that father paid mother $75,000 in two payments, which occurred on September 24 and 26, 2022.  In December 2022, mother

filed a memorandum of costs, claiming that she was entitled to $1,889 in postjudgment interest on the fee award and $144 in costs she incurred in enforcing the fee judgment (preparing and issuing abstract of judgment and recording and indexing abstract of judgment). Father did not file a motion to tax costs. In April 2023, after a hearing, the family court issued an order finding that father had satisfied the fee judgment "in full" by the court-ordered deadline. In so finding, the court expressly denied mother's request for postjudgment interest on the fee award and implicitly rejected mother's related request for the costs she incurred in enforcing the fee judgment. This was error.

Here, the $75,000 fee award was a monetary judgment that was not payable in installments. Father has not cited, and our independent research has not revealed, any authority holding that the fee award is properly considered an installment judgment. As such, interest accrued on the principal amount remaining unsatisfied at the rate of 10 percent per annum from the date judgment was entered--July 1, 2022.[18] (See Code Civ. Proc., § 685.020, subd. (a).) Further, mother was statutorily entitled to recover the costs she sought in connection with her enforcement of the judgment. (See Code Civ. Proc., §§ 685.040, 685.070, subds. (a), (d).) Accordingly, because the family court reached a contrary result, we will reverse the challenged order and remand for further proceedings. On remand, the family court shall determine in the first instance the postjudgment interest and costs to which mother is entitled. We need not and do not express an opinion on this matter.

---

[18] To the extent the family court concluded that it was not required to award postjudgment interest because father paid mother the full amount of the fee judgment prior to the court-ordered deadline, its conclusion was inconsistent with the law. The accrual of interest on a money judgment is governed by statute. (See Code Civ. Proc., § 685.020.) The court did not have discretion to alter the statutory date that interest began to accrue. (See *Stockton Theatres, Inc. v. Palermo, supra*, 55 Cal.2d at p. 442 [explaining that the general rule is that a judgment bears legal interest from the date of its entry in the trial court].)

## DISPOSITION

The challenged fee award (judgment) is affirmed.  The two challenged orders entered by the family court on April 26, 2023, are reversed and the matter is remanded for further proceedings consistent with this opinion.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3), (5).)

      /s/             
Duarte, Acting P. J.

We concur:


     /s/         
Mesiwala, J.


     /s/         
Feinberg, J.